UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                        Case No. 05-CR-82

GERARDO LOPEZ,

    Defendant.

---

### RECOMMENDATION ON MOTION TO SUPPRESS EVIDENCE

---

#### I. BACKGROUND

On March 15, 2005, a grand jury sitting in the Eastern District of Wisconsin returned a one count indictment against Gerardo Lopez ("Lopez"). The indictment alleges that on or about September 13, 2004, Lopez, having previously been convicted of a crime punishable by imprisonment for a term exceeding on year, knowingly possessed two firearms, to wit, a K.B.I. Inc., model GKK-45, .45 caliber semi-automatic pistol, and an R.G. model RG23, .22 caliber L.R., six-shot revolver, all in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment.)

Lopez has filed a motion seeking suppression of physical evidence, including the two guns, that was seized by officers of the Milwaukee Police Department from the apartment in which he lived, located at 1331 South 22nd Street, Milwaukee, Wisconsin. Lopez maintains that the evidence was seized in violation of his rights under the Fourth Amendment. This court conducted an evidentiary hearing on the matter on August 25, 2005. The parties were then afforded time after the

hearing to further brief their respective positions. Lopez's motion is now fully briefed and is ready for resolution. For the reasons stated below it will be recommended that Lopez's motion be denied.

**The Evidentiary Hearing**

The testimony presented at the August 25, 2005 evidentiary hearing is summarized as follows.

**Officer Todd Bohlen**

Officer Bohlen testified that he is a police officer with the City of Milwaukee Police Department assigned to the gang crimes intelligence division. On September 13, 2004, Officer Bohlen received an anonymous call regarding drug dealing at a duplex with the addresses 1331 and 1333 South 22nd Street, in Milwaukee. (Tr. at 6-7.) Officer Bohlen contacted District Six officers and learned that they had received similar complaints. Officer Bohlen and his partner, Officer Obregon, both dressed in plain clothes, proceeded to that location accompanied by four uniformed officers. (Tr. at 7-8.)

Upon arriving, the officers knocked on the door of the lower unit, 1333 South 22nd, and the door was answered by a Spanish speaking man. Bohlen, Obregon, and two of the uniformed officers entered the lower unit after receiving consent to do so from the man. The officers conducted a consent search of the lower unit, but found nothing of evidentiary value. (Tr. at 9-11.) Bohlen and three uniformed officers then proceeded up the back stairway to make contact with the upper residence, which is 1331 South 22nd Street. Officer Bohlen knocked on the back door and it was answered by Elena Cabral ("Ms. Cabral" or "Cabral"). (Tr. at 11-12.)

Officer Bohlen identified himself as a Milwaukee Police Officer and asked Cabral if he could come in and speak to her, and Cabral said yes. When Bohlen knocked on the door, one uniformed

2

officer was standing next to him on the landing and two additional officers were on the stairway leading down. (Tr. at 11-12.) Officer Bohlen testified that Cabral did not express any hesitation about letting him in, nor did she appear reluctant to let him in. At that point Bohlen and the three uniformed officers entered the kitchen area. (Tr. at 12-13.) Officer Bohlen testified that a boy approximately five years old was seated at the table in the kitchen. (Tr. at 13-14.)

Bohlen then informed Cabral of the complaint he had received and asked for consent to search the house for drugs and illegal items. Bohlen testified that Cabral "consented to that. She said go ahead." (Tr. at 13-14.) Cabral did not ask the police to leave her house or kitchen or otherwise exhibit any hesitation to continue her conversation with Bohlen. Furthermore, Bohlen testified that Cabral was very cooperative, seemed puzzled as to why the police were there, and did not hesitate at all in giving consent. (Tr. at 14-15.) Bohlen then sat down at the table with the boy. Cabral was frying some meat at the stove and the other officers were searching the apartment. This all occurred around 7:30 p.m. (Tr. at 16.)

Officer Bohlen testified that he spoke with Cabral while the other officers were searching. Cabral never indicated that she wanted the officers to stop searching or asked how long the search would take, nor did she express concern about having given consent to search. (Tr. at 17.) Cabral did not say that she felt coerced and nothing about her physical demeanor suggested that she was not calm. (Tr. at 18.)

While Officer Bohlen was sitting at the table, one of the officers came in and told him that they had found a safe. Bohlen left the kitchen to look at the safe. The safe was in a closet with some clothes on top of it. Bohlen than asked Cabral to come into the front room. Cabral did not indicate that she was no longer comfortable with the search continuing. (Tr. at 18-20.) Officer Bohlen asked

3

Cabral if she could open the safe so they could continue the search. Cabral said that the safe was not hers but belonged to her boyfriend, Gerardo Lopez. At this point Cabral appeared to be very nervous. (Tr. at 21-22.) Cabral did not, however, ask the officers to leave or say anything Bohlen interpreted as a sign that she was withdrawing consent for the search. (Tr. at 21-22.)

Officer Bohlen then asked Cabral if she could contact Lopez about opening the safe, but Cabral said she did not know how to contact him. Bohlen then testified that "I asked her if she would consent to a police dog coming in and sniffing the safe and she replied yes, go ahead, I don't care." (Tr. at 22-23.) Cabral never withdrew her consent for the dog to come into the apartment or stated that she preferred that the dog not be there. She also never said she wanted the officers out of the house. (Tr. at 23-24.)

Officer Bohlen then called the vice control division and requested that a dog be sent out. Lieutenant Beecher arrived at the apartment at approximately 8:30 p.m. with a dog named Jax. After being briefed, Lieutenant Beecher had Jax perform a sniff of the apartment. (Tr. at 24-27.) Beecher then informed Officer Bohlen that the dog had alerted on the safe, signifying that it contained contraband. Beecher determined that the safe would be removed from the apartment and Officer Obregon carried it downstairs. (Tr. at 28-29.)

Just before the safe was taken down, an elderly lady came up the stairway with a young child. Officer Bohlen believed the woman was somebody's grandmother. Officer Bohlen came to learn that the young child was Cabral's other son. (Tr. at 29-30.) After the safe was taken down the stairs, the officers left the apartment and the safe was taken to the police station. (Tr. at 32.) Officer Bohlen testified that the safe was removed because, based on Jax's alert, the officers had probable cause to believe the safe contained illegal narcotics. The safe was removed rather than securing the apartment

4

and waiting for a warrant, at least in part because securing the apartment would cause a greater disruption for the family. (Tr. at 37-38.)

On cross examination, Officer Bohlen testified that, upon initially coming to Ms. Cabral's back door, the officers did not have their weapons drawn. (Tr. at 40.) Officer Bohlen did not tell Cabral that she did not have to consent to the search, nor did he tell her that if she did not consent a warrant could be obtained. (Tr. at 42.) Bohlen testified that he received the anonymous call sometime before noon on that day, but did not go to the address until around 7:00 p.m. (Tr. at 44.) Officer Bohlen remembered calling in a check on Gerardo Lopez while in the apartment, but does not remember the results. (Tr. at 47.)

Officer Bohlen did not remember Cabral saying anything like, "you know, I honestly, I'm in the middle of leaving," nor was Cabral's son upset. (Tr. at 48.) Officer Bohlen could not remember whether he gave Cabral a receipt for the safe, but he did explain to her why they were taking it, and Cabral said okay. (Tr. at 52.)

**Officer Thomas Obregon**

Officer Obregon testified that he is a police officer with the Milwaukee Police Department, assigned to the gang crimes intelligence unit. Officer Obregon testified that he went with Officer Bohlen and approximately four or five uniformed officers to 1331 and 1333 South 22nd Street on September 13, 2004. (Tr. at 59-60.) Obregon went into the lower unit with Officer Bohlen, but then stayed in the lower unit while Bohlen went to the upper unit. Obregon eventually did come up to the upper unit. (Tr. at 62-64.)

Officer Obregon saw Cabral and her son in the kitchen, but did not himself speak with them. Obregon overheard some conversation between Cabral and Bohlen, but never heard Cabral say that

5

Case 2:05-cr-00082-CNC   Filed 11/15/05   Page 5 of 18   Document 31

she wanted the officers to leave, or that she was withdrawing or rescinding consent for the search. (Tr. at 64-66.) After the drug dog "hit" on the safe, Officer Obregon carried it down the stairs. It was about that time that the grandmother and the other young child showed up. (Tr. at 70-71.) At no time did Officer Obregon hear Cabral tell anyone that she didn't want the safe removed from the house, or that she wanted the officers to leave the house, or that she felt intimidated or coerced. (Tr. at 72.)

On cross examination, Officer Obregon testified that he never heard Cabral tell any of the officers, "okay, its time for you to leave," or that she was in the middle of leaving. (Tr. at 78.) Obregon further testified that all of the officers had firearms on their holsters that were visible to Cabral. (Tr. at 81.)

**Lieutenant Victor Beecher**

Lieutenant Beecher testified that he is a lieutenant of detectives with the Milwaukee Police Department currently assigned to the sensitive crimes division. On September 13, 2004, Lieutenant Beecher was assigned to the drug interdiction unit and was a certified drug detection dog handler. (Tr. at 91-93.) Beecher testified as to the training and operation of drug dogs, including the dog he handles, Jax. (Tr. at 94-98.)

On September 13, 2004, Lieutenant Beecher responded, with Jax, at the request of Officer Bohlen, to 1331 South 22nd Street. Lieutenant Beecher testified in detail as to how Jax searched the apartment, the end result being Jax "hitting" on the safe. (Tr. at 98-105.) Beecher then described the policy of the Milwaukee Police Department to remove a safe from a residence if there is probable cause to believe it contains contraband, rather than securing the apartment and waiting for a warrant.

Beecher opined that because Jax had alerted on the safe, there was probable cause to believe it contained contraband. (Tr. at 107-10.)

On September 14, 2004, Lieutenant Beecher drafted an affidavit in support of a search warrant for the safe based on Jax's alert the day before. The warrant was authorized by Court Commissioner Dennis R. Cimpl on September 14, 2004. (Tr. at 110-12.) Lieutenant Beecher forcibly opened the safe. (Tr. at 126-27.)

Lieutenant Beecher testified that while at the apartment Cabral did not speak directly to him. Beecher never heard Cabral ask any of the other officers to leave. According to Beecher, Cabral "didn't seem particularly bothered by our presence." (Tr. at 114-15.) Beecher further testified that, "[i]t does happen where we, the police department, we are in a place and consent is withdrawn. That does happen. And in those cases the officers, and especially experienced officers like Officer Bohlen, he knows exactly what needs to be done. He will tell me and we will withdraw. If we can get a search warrant for the premises, then we'll get a search warrant for the premises. That never, that was never an issue here." (Tr. at 116.)

Lieutenant Beecher testified that it is department policy to give a person a receipt when property is taken by the police. He did not give Cabral a receipt for the safe, but he was not the one who removed it from the apartment either. (Tr. at 124-25.) According to Beecher, one reason why the safe was removed, rather than having officers secure the scene while a warrant was obtained, was safety concerns. There is a potential that persons interested in the contents of the safe would attempt to harm officers who are securing the scene. (Tr. at 126.)

**Elena Cabral**

Elena Cabral testified that she has been dating the defendant, Gerardo Lopez, for about four years. On September 13, 2004, Cabral was at home when the police knocked on her back door. Cabral looked out the window and saw two detectives and four uniformed police officers outside. They told Cabral that they were there to investigate a complaint about drugs being sold out of the home and asked if they could come in. Cabral allowed the officers to come inside. (Tr. at 133-34.) Cabral testified that one of the police officers asked if she minded if they came in and took a look around, and she said that would be fine. (Tr. at 135.)

Cabral's seven year old son, Miguel, was in the kitchen with her. The officers were looking through drawers and rummaging through things. The officers also unscrewed a screw in the ceiling and attempted to look into the ceiling, knocking some "chalky stuff" from the ceiling in the process. (Tr. at 136-37.)

Cabral testified that there came a time when she wanted the police to stop looking around. She told the officers, "okay, I'm in the middle of leaving and I would like for you guys to stop looking. I said, I let you guys in willingly to talk to you, you said that this wasn't going to be a big deal, and I asked if they could leave." (Tr. at 138.) Part of the reason Cabral wanted the police to leave was because her son was upset and frightened. After Cabral asked the police to leave, they just continued to search. She then "asked them at that time, well, do you have a search warrant? I said if you have a search warrant I'd like to see it, and they said no. Basically I just kept repeating myself, if they could leave. And I believe at that time that's when they found the safe in the closet." (Tr. at 139.) Cabral testified that she asked the police to leave before they found the safe, and she kept asking them to leave for a "good two, three minutes." (Tr. at 140.)

8

The police then asked Cabral if she could open the safe, and she said she could not. At that point the police told Cabral that they were bringing a dog; they did not ask if they could bring the dog. Cabral was outside in front of the house with her son's grandmother when the dog arrived, and she did not see the dog inside the apartment. Cabral saw the safe taken down the front stairs and was not given a receipt. (Tr. at 140-42.)

On cross examination, Cabral stated that she is 25 years old and went as far as the tenth grade in school. She is currently a cook/dietary aid at a health care rehabilitation center. Cabral has two children, Armarando, who is five, and Miguel, who is seven. (Tr. at 142-44.)

When Cabral first saw the police out the back window, she was "a little caught off guard" because people usually come to the front door. The officers never told Cabral that she had to let them in the house. Cabral allowed them to come into the house although she felt "afraid because my son was there and I didn't want anything to happen in front of my son." Cabral, however, voluntarily let the officers in. (Tr. at 145-47.)

Cabral asked one of the detectives if the officers could leave, and he responded that she should give him some more time, "he just said give me some more time." (Tr. at 151.) The detective did not really respond to Cabral's repeated requests for them to leave; the officers just kept doing what they were doing. (Tr. at 152.) Once the officers found the safe, but before the dog arrived, Cabral again asked them to leave, but "they said they had enough probable cause to stay there." (Tr. at 154-55.)

The woman who had been previously identified as "grandma" is Cabral's husband's (Luis Cabral) mother. Her name is Graciela Mena. Mena arrived at the apartment alone, she did not have Cabral's younger son with her. (Tr. at 155-56.) Cabral testified that the statement in her affidavit

9

which said that Mena arrived with her son Armarando was incorrect. Cabral had read the affidavit before she signed it, but missed that mistake. (Tr. at 156-59.)

On re-direct Cabral testified that she did find it scary when all six officers were in her kitchen, which is "very little." Cabral was given a copy of her typed affidavit to review by Lopez's attorney. However, she was at work at the time and didn't get a chance to look it over carefully. (Tr. at 161-62.)

## II. DISCUSSION

### A. Search of the Apartment

It is undisputed that at the time the police officers searched the apartment at 1331 South 22nd Street and seized the safe containing the drugs and guns, they did not have a warrant authorizing them to do so. The government asserts that the authority to search the apartment was based on the consent of Elena Cabral.

A search authorized by consent is wholly valid as long as the consent was "freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of establishing that consent was freely and voluntarily given. *Id*. Whether an individual voluntarily consented to a search is a factual assessment that turns on the totality of the circumstances. *United States v. Raibley*, 243 F.3d 1069, 1075 (7th Cir. 2001). Relevant factors in determining voluntariness include (1) the person's age, intelligence, and education, (2) whether the person was advised of his or her constitutional rights, (3) how long the parson was detained before giving consent, (4) whether consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he or she gave consent. *Id*. at 1075-76. If, however, the individual did not freely and

voluntarily consent, but "simply acquiesced to a show of authority," that is insufficient to demonstrate consent. *Id*. at 1076.

Furthermore, consent to search does not have to be given by the defendant. Consent is valid if it is given by a person with common control over the searched premises, or apparent authority to consent to the search. *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000). A person has apparent authority to consent to a search if "the facts available to the officer at the moment [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quotation marks omitted).

Consent to a search is not an all or nothing proposition. "[A] person may limit or withdraw his consent to a search, and the police must honor such limitations." *United States v. Dyer*, 784 F.2d 812, 816 (7th Cir. 1986); *United States v. Mitchell*, 82 F.3d 146, 151 (7th Cir. 1996). "However, when a suspect does not withdraw his valid consent to a search before the illegal weapon or substance is discovered, the consent remains valid and the seized illegal item is admissible." *Mitchell*, 82 F.3d at 151. In this regard, "[t]he standard for measuring the scope of a suspect's consent . . . is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Some courts have held that once consent has been given, there must be an "unequivocal act or statement of withdrawal" to effectuate withdrawal of the consent. *United States v. Ross*, 263 F.3d 844, 846 (8th Cir. 2001); *United States v. Alfaro*, 935 F.2d 64, 67 (5th Cir. 1991).

It is the government's burden to establish that Cabral's consent was freely and voluntarily given. In this regard, Officer Bohlen testified that he asked Cabral for consent to search the house for drugs and illegal items and Cabral consented. (Tr. at 14.) Furthermore, Bohlen testified that

11

Cabral did not hesitate in giving consent, and was very cooperative. (Tr. at 14-15.) Later, after the officers located the safe, Bohlen testified that he asked for consent for the dog to come into the house: "I asked her if she would consent to a police dog coming in and sniffing the safe and she replied yes, go ahead, I don't care." (Tr. at 23.)

Cabral testified that she said it "would be fine" for the officers to come in and take a look around. (Tr. at 135.) The defendant argues that, although Cabral "testified that she voluntarily agreed and consented to the police entering her apartment and conducting a search therein," her consent nevertheless was not voluntary. (Def.'s Post-Evidentiary Hearing Brief [Def.'s Br.] at 1.) In support of this argument, Lopez points to the fact that there were six police officers inside Cabral's apartment when she gave consent, that Cabral found it "scary" to have so many police officers in her kitchen, that Cabral was "caught off guard" by the officers' coming to her back door rather than her front door, and the fact that the police did not advise Cabral of any of her rights, including her right to refuse to consent. (Def.'s Br. at 1.)

In my opinion, none of the factors pointed out by Lopez establish that Cabral's consent was not freely and voluntarily given. To be sure, Cabral might have felt intimidated by the presence of several police officers at her back door, and then in her kitchen. It is also undisputed that none of the officers specifically told Cabral about her constitutional rights. On the other hand, Cabral presents as a woman of at least average intelligence. She is 25 years old, and has gone as far as the tenth grade in school. Moreover, when Cabral consented to the search of her apartment, she was not under arrest or in any way detained. Furthermore, there is no evidence that the police displayed firearms, threatened physical force, or badgered her with repeated requests for consent. In sum,

examining the totality of the circumstances surrounding Cabral's consent for the police to search her apartment, I am persuaded that her consent was freely and voluntarily given.

Lopez next argues that, even if Cabral's consent was effective at the outset, she revoked that consent before the police located the safe in which the contraband was located. Therefore, the continued search was illegal and the physical evidence discovered in that safe must be suppressed.

In this regard, Cabral testified that she repeatedly asked the officers to leave the apartment. By contrast, Officer Bohlen testified that Cabral never withdrew her consent or asked them to leave or stop searching. Furthermore, although neither Officer Obregon nor Lieutenant Beecher spoke directly with Cabral, neither of them heard Cabral either revoke her consent or ask the officers to leave.

In the end, if I were to credit fully Cabral's testimony, then the continued search was illegal. After all, a reasonable person could not believe that they had consent to continue searching if they were told specifically to stop searching or to leave the apartment. On the other hand, if I were to credit the testimony of the officers, and find that Cabral never communicated to the officers her desire for them to stop searching, then Cabral's initial consent to search the apartment remained in effect at the time the safe was discovered and subsequently sniffed by Jax.

I start by noting that the police officers' testimony was credible. There was nothing about the testimony of Officer Bohlen, Officer Obregon, or Lieutenant Beecher which leads me to believe they were lying in any fashion. To be sure, the officers did not recall every detail about what was said that day, but in my estimation, an express withdrawal of consent would be something that a police officer would be attuned to, and not easily forget. Furthermore, although the police officers in this case are interested parties in the sense that they have an interest in seeing a crime that they

13

investigated successfully prosecuted and not bungled because of something they did wrong, they do not have a deep personal interest in the outcome of this particular case.

On the other hand, although Ms. Cabral presented a pleasant personality on the witness stand, she most definitely has a personal interest in the outcome of this case. After all, the defendant is her boyfriend and she hopes that they will marry some day. (Tr. at 161.) She also knows that it was she who allowed the officers to conduct the search that led to the discovery of the safe and its inculpatory contents. Acknowledging to her boyfriend that she freely and voluntarily consented to such a search is understandably a most difficult thing to do.

To be sure, Ms. Cabral may have internally harbored a desire for the police to leave, and may have even expressed some desire for them to finish up their search so that she could leave. But this is not the same as making an unequivocal act or statement withdrawing her consent for the search. *See Ross*, 263 F.3d at 846. Nor, in my opinion, would such a statement be understood by a typical reasonable person to signal a withdrawal of consent. *See Florida v. Jimeno*, 500 U.S. at 251. And to reiterate, all of the officers testified that they did not hear her tell them that she wanted them to stop searching and to leave.

Simply stated, in order for me to find that Ms. Cabral clearly and expressly withdrew her consent to search, I must find that (1) Officer Bohlen lied when he testified that Ms. Cabral never told him that she wanted the officers to stop searching and (2) Officer Obregon and Lieutenant Beecher likely lied when they testified that they never heard Ms. Cabral withdraw her consent. This I am not prepared to do, for the simple reason that I find Officer Bohlen, Officer Obregon and Lieutenant Beecher to be credible.

14

In conclusion, I am persuaded that the police officers were not unequivocally told by Ms. Cabral to stop searching or to leave the apartment. To the extent that Ms. Cabral's testimony is directly contrary to the officers' testimony on that issue, such testimony is rejected. Whether Cabral may have made other statements which she subjectively believed conveyed her desire for the officers to leave is of no moment. The bottom line is that Cabral did not make statements which would have been interpreted by a typical reasonable person to revoke the consent which she had previously given.

**B. The Seizure of the Safe**

It is uncontroverted that the police seized the safe containing the contraband on September 13, 2004, but did not obtain a warrant to search the safe until September 14, 2004. Lopez contends that the officers' seizure of the safe therefore violated his Fourth Amendment rights. Lopez argues that, in the absence of a warrant, it would have been proper for the police to secure the apartment and wait for a warrant, but not to seize the safe. (Def.'s Reply at 4.)

Indeed, "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura v. United States*, 468 U.S. 796, 810 (1984). It is clear that the police had probable cause to believe that the safe contained contraband based on the drug dog's alert. This is evidenced by the fact that Court Commissioner Cimpl signed a search warrant based on an affidavit stating as much. The only question, then, is whether removing the safe and obtaining a warrant the next day, rather than securing the apartment for the time it would have taken to obtain a warrant, was unreasonable.

In *Segura*, agents secured an apartment for some 19 hours while waiting for a warrant. *Segura*, 468 U.S. at 801. The court assumed arguendo that securing the apartment constituted a

15

seizure of the entire apartment and all that was in it, and concluded that such seizure was not unreasonable. *Id*. at 806; *see also United States v. Scheets*, 188 F.3d 829, 840 (7th Cir. 1999) ("Law enforcement officers may seize an area to avoid the destruction or removal of evidence when probable cause to search the area exists."). If the seizure of an entire apartment and its contents while waiting for a warrant, based on probable cause to search, is not unreasonable, then certainly seizing only one item from inside the apartment, also based on probable cause and while waiting for a warrant, is not unreasonable. In short, it was not unreasonable for the police to seize the safe based on probable cause to believe that it contained illegal narcotics while a warrant was being applied for.

The only other argument that Lopez can make is that the police did not seek the warrant within the same time frame as they may have if they had secured the apartment. In other words, if the police had decided to secure the apartment at 1331 South 22nd Street and wait for a warrant, they surely would have sought a warrant that evening, instead of waiting until the next day. While this may be true, in my opinion it does not render unreasonable the course of conduct that the police did take.

"The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render [a] search unreasonable." *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973). In the case at hand, the police perhaps could have gone to a judge after hours and sought a warrant that night. This may have been "less intrusive" in some sense, although I am not sure how. It is hard to accept the proposition that securing the apartment into the night to await the obtaining of warrant to search the safe is less intrusive than removing the safe to the police station to await the obtaining of the warrant.

16

In any event, the police are not obligated to search out the least intrusive course of conduct, especially when it is not clear that one course of conduct is less intrusive than another. *Chambers v. Maroney*, 399 U.S. 42, 51-52 (1970). In the context of searches and seizures, the conduct of the police is measured not by whether it was the least intrusive method available, but by whether it was reasonable. *See id.* at 52. For all of the aforementioned reasons, I conclude that it was not unreasonable for the police officers to remove the safe, based on probable cause, and apply for a search warrant the next day.

Finally, Lopez argues that the physical evidence should be suppressed because the police failed to give Ms. Cabral a receipt for the safe they seized. In support of this argument Lopez cites to Fed. R. Crim. P. 41 and to case law suppressing evidence where police failed to provide a copy of a warrant to the resident of a premises. (Def.'s Reply at 7.)

Rule 41(f)(3) does require an officer executing a warrant to "give a copy of the warrant and a receipt for the property taken to the person from whom . . . the property was taken." However, when they seized the safe in the case at hand, the officers were not executing a warrant. Now while it is true that Milwaukee Police Department procedure calls for the issuance of a receipt when property is taken by police (Tr. at 125), that does not mean that failure to do so calls the exclusionary rule into play. Lopez has not provided any support for the proposition that failure, under Milwaukee Police Department procedure, to issue a receipt for property seized upon probable cause is a violation of the Fourth Amendment.

In conclusion, I am persuaded that Ms. Cabral freely and voluntarily consented to a search of her apartment. I am further persuaded that she did not at any time thereafter communicate to the officers that she was withdrawing such consent. Finally, I am persuaded that the police officers'

17

Case 2:05-cr-00082-CNC   Filed 11/15/05   Page 17 of 18   Document 31

action in securing the safe by removing it from the apartment until a search warrant could be applied for and obtained the next day was reasonable. Consequently, and for all of the foregoing reasons, it will be recommended that the defendant's motion to suppress physical evidence be denied.

**NOW THEREFORE IT IS RECOMMENDED** that the defendant's motion to suppress physical evidence be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

**SO ORDERED** this 15th day of November 2005, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge